**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION**

**GENE WILLARD GAYLOR,**

    **Petitioner,**

**v.**                         **Civil Action No. 5:02-1206**

**THOMAS MCBRIDE, Warden,
Mount Olive Correctional Complex,**

    **Respondent.**

<u>**MEMORANDUM OPINION**</u>

Pursuant to the court's order of September 22, 2005, in which the court overruled both petitioner's objections to Magistrate Judge R. Clarke VanDervort's Proposed Findings and Recommendation [hereinafter "Findings and Recommendation" or "F & R"], confirmed and accepted the F & R, and indicated that an explanatory memorandum opinion would follow forthwith, the court now issues its memorandum opinion.

On October 3, 2002, petitioner filed a petition under 28 U.S.C. § 2254 for a writ of habeas corpus. By Standing Order entered on June 19, 2003, this case was referred to United States Magistrate Judge R. Clarke VanDervort for proposed finding and recommendation as to disposition.

On February 28, 2005, the Magistrate Judge entered his Proposed Findings and Recommendations as to respondent's motion to dismiss, or, in the alternative, motion for summary judgment (Docket No. 34). In the F & R, the magistrate judge proposed

that the district court grant respondent's motion for summary judgment with prejudice regarding five of petitioner's six claims, and to remand the sixth claim to him for further proceedings regarding petitioner's final claim.

On March 24, 2005, petitioner filed a number of objections to the magistrate judge's findings.  For the reasons discussed below, the court overruled petitioner's objections in its previous order and ordered that this case be remanded to the magistrate for further proceedings.

### A.  Factual Background

In the early morning hours of February 6, 1976, Billy Ray Abshire ("Abshire") died as the result of the explosion of a homemade bomb contained in a box located on the roof of his car. Prior to Abshire's death, his wife, Katherine Abshire, was having an extramarital affair with Carroll Eugene Humphries, a local insurance agent.  At trial Humphries testified that he had been acquainted with petitioner for a number of years through legitimate insurance dealings.

Before the death of Billy Ray Abshire, Humphries wanted to marry Katherine Abshire, but Billy Ray Abshire would not agree to a divorce.  Humphries testified that he went to petitioner to seek advice on obtaining a Las Vegas divorce on behalf of Katherine Abshire.  For this advice, Humphries agreed to pay petitioner $2,000 for petitioner's expertise on obtaining the

divorce.  (Docket No. 27, Exh. 16 at 649-51.)  Approximately two days after the death of Billy Ray Abshire, Humphries paid $2,000 to petitioner for his "advice."  (Id. at 656.)

Abshire's death was investigated by local law enforcement and federal officials associated with the Department of Alcohol, Tobacco, and Firearms ("ATF").  (Docket No. 27, Exh. 15, at 535-36.)  Following an investigation, the ATF determined that Abshire had accidently killed himself with a bomb of his own making and closed their investigation.  (Id. at 536.)  Four months after Abshire's death, Carroll Humphries and Kathryn Abshire married.  (Docket No. 27, Exh. 16 at 646.)

In 1978, Carroll Humphries began receiving threatening letters from an extortionist.  The extortionist demanded money from Humphries and threatened to expose his involvement in the Abshire murder if he did not comply.  (Docket No. 27, Exh. 17 at 75.)  Humphries negotiated with the extortionist without notifying law enforcement until the day a bomb was detonated in his yard.  (Docket No. 27, Exh. 17 at 75.)  After the explosion, Humphries notified law enforcement and the FBI began to monitor the threatening calls and letters.  A container, previously implanted with an electronic transmitter, was picked up by the extortionist.  The signal from the transmitter led law enforcement officials to the home of a relative of petitioner.  The authorities found the transmitter in petitioner's underwear.

-3-

(<u>Id.</u>)  Petitioner was subsequently charged with the extortion by mail of Carroll Humphries.  Following a jury trial, petitioner was convicted in May 1978, of four counts of extortion by mail and sentenced to a term of imprisonment of 20 years.

A few days after petitioner's conviction, he contacted federal authorities and arranged a meeting.  (Docket No. 27, Exh. 17, at 122-36.)  During the meeting, petitioner made statements about his knowledge of several bombings crimes and murders.  (<u>Id.</u> at 81-82.)  However, petitioner neither confessed to any of these crimes nor admitted any direct involvement in them; instead, he attributed the crimes to a Richard Beyers.  (<u>Id.</u> at 87.)  Because none of the information offered by petitioner was specific, no charges were brought against petitioner as a result of the meeting.  (<u>Id.</u> at 87.)  However, during the course of the meeting, petitioner's information demonstrated that he was aware of intricate and detailed knowledge concerning a number of crimes.  (<u>Id.</u> at 90-93.)

In July 1998, West Virginia State Trooper Michael Spradlin, assigned to a Greenbrier County cold-case unit, took an interest in the death of Billy Ray Abshire after a prosecuting attorney showed him a photograph of Abshire's body.  (<u>Id.</u> at 194, 220.)  The prosecuting attorney had found this photograph in the course of cleaning out files.  Trooper Spradlin undertook to reopen the case and began by interviewing petitioner's brother, Clayton

-4-

Wayne Gaylor.  During the course of this investigation, Clayton Gaylor told Spradlin that petitioner had murdered Abshire.  (<u>Id.</u> at 197.)  Petitioner and several others were indicted in connection with Abshire's murder.  In a separate trial, Carroll Humphries was convicted of aiding and abetting and conspiracy in the murder of Billy Ray Abshire.  (<u>Id.</u>)

Because petitioner appealed his conviction and fully exhausted the state habeas process through appellate review, his case is ripe for review by the federal courts.

### B.  Standard of Review

In order to demonstrate that he is entitled to federal habeas relief, petitioner must demonstrate that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); <u>Wainwright v. Goode</u>, 464 U.S. 78, 83 (1983) ("It is axiomatic that the federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.").

Section 2254(d) provides that when the issues raised in a § 2254 petition were raised and considered on the merit in state court habeas proceedings, federal habeas relief is unavailable unless the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A federal court examining a habeas petition may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the state court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Williams v. Taylor, 529 U.S. 362, 412-413 (2000). In making this determination, all factual determinations by the state court are entitled to a presumption of correctness. 28 U.S.C. § 2254(e).

When a state curt fails to address an issue, or fails to articulate a rationale behind its ruling, the federal courts "must independently review the record and the applicable law; however, the review is not a de novo review." Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000), cert denied sub nom., 534 U.S. 830 (2001). Rather, the federal court must conduct a review applying a deferential standard in which it must only determine

-6-

whether the state court's decision is legally and factually reasonable.  Id.

## C. Analysis

Petitioner objects to the findings of the magistrate judge as to every claim he originally raised.  Petitioner's first objection is that his ability to defend himself was prejudiced by the twenty-two year delay between the occurrence of the alleged offense and the indictment.  (Obj. at 1.)  Petitioner's second objection is that his conviction resulted from prosecutorial misconduct, specifically the threatened use of information petitioner allegedly provided under a blanket grant of immunity by prosecutors.  (Id. at 8.)  Petitioner's third objection is that the magistrate judge did not make a finding as to alleged violations of his rights under the Confrontation Clause of the Fifth Amendment of the United States Constitution.  (Id. at 12.) Petitioner's fourth objection is to the magistrate judge's findings as to the introduction during his trial of evidence of his past crimes.  (Id.)  Petitioner's fifth objection is that his counsel was ineffective in terms of his preparation and work at trial.  (Id.)  Petitioner's sixth and final objection is that his conviction was the result of perjured testimony and prosecutorial misconduct.  (Id.)  The court conducts a review of each of these objections in turn.

1.   **The Twenty-Two Year Delay Between the Occurrence of this Offense and the Indictment of Petitioner Did Not Violate Petitioner's Constitutional Rights**

Petitioner's first argument is that the twenty-two year delay between the explosion that resulted in the death of Billy Ray Abshire and his indictment was a violation of his constitutional rights.  (Obj. at 1.)  Specifically, petitioner contends that Supreme Court precedent established that a twenty-two year delay between the occurrence of an offense and trial is presumptively prejudicial.  (Id. at 2.) (citing Dickey v. Florida, 398 U.S. 30 (1970); Howell v. Baker, 904 F.2d 889 (4th Cir. 1990); and State ex rel. Leonard v. Hey, 269 S.E.2d 394 (W. Va. 1980)).  Petitioner argues that a twenty-two year delay between the alleged commission of a crime and the commencement of prosecution regarding that crime is presumptively prejudicial and respondent has not rebutted this presumption.

Petitioner is wrong.  In determining whether a pre-indictment delay mandates the dismissal of an indictment on the basis of a Fifth Amendment due process violation, the court must first consider whether petitioner has demonstrated "actual prejudice" as a result of the state's delay, and then weigh the gravity of the prejudice against the state's justification for the delay.  Jones v. Angelone, 94 F.3d 900, 905 (4th Cir. 1996).[1]

---

[1]  Petitioner also argues that the delay violated his right to a speedy trial under the Sixth Amendment.  (Docket No. 1 at 22.)  This argument is incorrect because the speedy trial

When balancing the prejudice against the justification, "[t]he basic inquiry . . . becomes whether the government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency." Howell v. Barker, 904 F.2d 889, 895 (4th Cir.), cert. denied, 498 U.S. 1016 (1990).[2]

Petitioner notes seven areas in which the twenty-two year delay compromised his efforts to defend himself.  The court addresses each in turn.

### a.   Loss of Physical Evidence

Petitioner avers that he was prejudiced by the loss of "physical evidence relating to the alleged crime, that being, the bomb, vehicle, crime scene, and the surrounding area."  (Docket No. 1 at 24.)  Petitioner states that he was unable to examine bomb debris or conduct DNA tests.  (Docket No. 28 at 7.) Petitioner further states that he was unable to produce records

---

provisions of the Sixth Amendment are not triggered until "arrest, indictment, or other official accusation."  See Doggett v. United States, 505 U.S. 647, 655 (1992).  Because petitioner does not complain that his criminal proceedings were delayed between the time of the indictment and trial, petitioner has failed to establish a violation of the Sixth Amendment.

[2]  The Fourth Circuit's standard in Howell is more lenient than that applied in most other circuits.  See Jones v. Angelone, 94 F.3d 900, 905 (4th Cir. 1996) (listing cases).  Because petitioner fails under the Fourth Circuit's more lenient standard, he necessarily also fails under the standard used in other circuits which would require him to demonstrate that the dely was a result of a tactical delay by government officials.

from motels to rebut his brother's testimony regarding a meeting petitioner allegedly attended and to demonstrate that he had a hotel room in Charles Town, West Virginia on the days surrounding Abshire's death.  (<u>Id.</u> at 8.)  Finally, petitioner alleges that he was unable to produce telephone records necessary to rebut testimony that he telephoned his brother the day after Abshire died.  (<u>Id.</u>)

Respondent rebuts petitioner's argument, claiming that "[t]here was no less evidence regarding the scene of the crime and the condition of the body 22 years after the fact than there would have been a few months after the murder." (Docket No. 27 at 12.)  Respondent disputes the notion that simply because evidence is lost, it must be inculpatory.  Here, "most of the alleged missing evidence was reconstructed by witness testimony, and any delay actually worked to [petitioner's] benefit."  (<u>Id.</u>) Moreover, Dr. Irwin Sopher, Chief Medical Examiner for the State of West Virginia, testified as to the details of Abshire's autopsy report, and photographs of Abshire's body were admitted into evidence.  These photographs not only depicted the victim's body, but also "portrayed the car, the trees around the bomb-blast area, and the general state of the scene following the murder."  (<u>Id.</u>)  Respondent contends that these photographs are all that would be available under the best of circumstances short

of the perpetrator conducting an investigation immediately in anticipation of being prosecuted.  (Id.)

Having reviewed the record, petitioner's argument is without merit.  With respect to the bomb, former ATF agent Andrew J. Beck, one of the original investigators in this case, testified that very little debris of the actual bomb was ever recovered. (Docket No. 27, Exh. 15 at 535.)  Further, after investigating the scene and following leads on several people who may have been involved, he closed the case and concluded that Abshire had "accidentally killed himself."  (Id. at 536.)  Robert Quillen, one of the first persons to find Abshire, testified that the photographs published to the jury accurately portrayed the crime scene he recalled.  (Id. at 464.)  Another person among the early-arrivers to the scene, Miles Craig Kochenderfer, was an off-duty West Virginia State Trooper who immediately corded off the area to make it secure, searched the premises, and took photographs that he described as accurate depictions of the scene.  (Id. 723, 732-50.)

In view of this evidence, the court must agree with the magistrate judge that petitioner has not shown any prejudice as to the delay regarding physical evidence.  Similarly, petitioner has done nothing to show how DNA testing could possibly exonerate him.  As such, the court finds that petitioner has failed to

demonstrate "actual prejudice" with respect to his claim of lost evidence.

### b.  Loss of Witnesses

Petitioner next alleges that he was prejudiced by an inability to produce two witnesses, retired West Virginia judge Richard Forsight and Harry Custer, who would testify that on February 5, 1976, petitioner was with them at the Liberty Bell Race Track in Philadelphia, Pennsylvania.  (Docket No. 1 at 24.) Further, petitioner argues that Curtis C. Willis, a friend of Abshire's, could have testified that he helped Abshire build the bomb as Abshire's son had told investigators.  (Docket No. 28 at 7.)  Finally, petitioner alleges prejudice resulting from the unavailability of Robert Earl Gaynor, his brother, who would have testified that Clayton Gaylor's testimony about an alleged telephone conversation was false.  (Id.)

Respondent contends that this alibi testimony "is suspect not only in its substance, but in its potential effect on the outcome of trial."  (Docket No. 27 at 13.)  Further, respondent contends that there is but a slim probability that alibi witnesses such as these would change the outcome of the trial because an alibi would be an obvious defense to a crime like this.  (Id.)  Because petitioner's presence was not required at the scene of the murder as testimony at trial revealed someone else placed the bomb at the scene, these witnesses' testimony

-12-

would not have made any difference to the jury.

In _Jones_, the Fourth Circuit stated that when challenging the unavailability of witnesses, a party must

> identify the witnesses he would have called;
> demonstrate with specificity, the expected
> content of the witnesses' testimony;
> establish to the court's satisfaction that he
> has made serious efforts to locate the
> witness; and show that the information the
> witness would have provided was not available
> from other sources.

_Jones_, 94 F.3d at 908.  As the magistrate noted, there is nothing of record to confirm that these witnesses would have testified as petitioner alleges and no proof that, regardless of the content of their testimony, that this information was not available from some other source.

The main reason why this argument must be rejected, however, is that petitioner has presented not a scintilla of proof as to how the testimony of these witnesses would change the outcome of his initial trial.  As respondent noted, when trial testimony indicates that someone else planted a bomb, any jury would see through an alibi such as the one claimed by petitioner as entirely too obvious.  The court rejects petitioner's arguments that the testimony of these men would have destroyed his brother's testimony which incriminated petitioner.

As to petitioner's brother Robert Earl Gaynor, the telephone conversation petitioner alleges never happened appears to be

immaterial to the outcome of the case.  As such, the court dismisses petitioner's argument regarding the effect on the twenty-two year delay on the availability of witnesses.

### c.  Loss of Records

Petitioner's third argument in this area is that he was prejudiced by not having access to the records of laboratory testing performed on bomb debris.  (Docket No. 1 at 24.) Respondent counters that any laboratory results would, at their most helpful toward petitioner, only be duplicative of the testimony of Agent Beck, who read into the record a report be had prepared in 1976, which indicated that Abshire's death was accidental.  It read:

> After exhausting all possible leads and sorting all the evidence and facts, the only logical conclusion is that [Abshire] killed himself accidentally.  He had a very strong motive; he had the knowledge and skill to construct a destructive device; he had the opportunity; he had access to the necessary components; and he had a peculiar personality which made him capable of such a crime.  It was established that Abshire used an old type of razor for shaving, the same type and brand that was in the box of explosives.  At his place of employment he had access to Hercules blasting caps and Kinepak explosives.  Our forensic laboratory in Washington identified components removed from Abshire's body as being from a Hercules cap.  They also believe the explosive was Kinepak.  Also, in a shed used by Abshire as a small workshop, we located a Hercules electric blasting cap on the floor.  With the absence of any type of timing device, the trigger had to be a pressure release or an anti-movement device.

>           Evidently, Abshire in the construction failed
>           to include a safety-arming device, his last
>           fatal mistake.

(Docket No. 27 at 561-62.)

Given the information contained in this laboratory report, petitioner has not alleged what other facts would have resulted in his acquittal.  At his trial, an agent of the ATF read a report he had prepared contemporaneous to Abshire's death in which the agent concluded that Abshire had blown himself up in the course of building a bomb.  Petitioner in no sense has demonstrated how the loss of the physical report prejudiced him. Further, because petitioner's claim that he was detrimentally affected by the loss of memos of the county prosecutor is both vague and conclusory, he has not demonstrated actual prejudice regarding them either.  As such, this claim is OVERRULED.

### d.  Absence of a Police Report

Petitioner's next claim is that he was prejudiced by the absence of a police report which "claimed Abshire's son saw his father and Curtis C. Willis construct the bomb."  (Docket No. 1 at 24.)  Respondent asserts that pursuant to Rule 801(c) of the West Virginia Rules of Evidence, any such report would have been excluded because it "would have been an out-of-court statement introduced for the truth of the matter asserted."  See W. Va. R.

Evid. 801(c).[3]  Rule 801(c) defines hearsay as "a statement,
other than one made by the declarant while testifying at the
trial or hearing, offered in evidence to prove the truth of the
matter asserted."  Id.

Were the report to have been available, it may have been
possible under West Virginia Rule of Evidence 803(6) or its
equivalent common-law rule to use this report to refresh the
recollection of the victim's son had he testified that he had
forgotten saying that he had seen his father and Willis build the
bomb, or to impeach him if he stated that he never said anything
of the sort.  The victim's son was not called to testify at
petitioner's trial.  Had he been called as a witness for the
prosecution, and this document been available, it would be useful
in his cross-examination.

Petitioner does not argue for this use.  Petitioner argues
that the loss of this document is prejudicial to his case because
the report states that the victim, and not petitioner, built the

---

[3] Regarding hearsay, the West Virginia Rules of Evidence
track common-law precedent.  Bd. of Educ. of McDowell Cty. v.
Zando, Martin & Milstead, 182 W.Va. 597, 614, 390 S.E.2d 796, 814
(1990) (discussing hearsay before and after the adoption of the
West Virginia Rules of Evidence and indicating that the Rules
adoption did not significantly change the law in this area).  As
such, any possible ex post facto argument by petitioner is
foreclosed for the reasons discussed above.

bomb.  This use is excluded as hearsay.[4]  Because its only use given the victim's son was never called at trial is as excluded hearsay, and because there is no other than through rank speculation of establishing what the victim's son would have testified to had he been called as a witness and the document placed before him, petitioner cannot demonstrate actual prejudice from its loss.

### e.  Officer Kochenderfer's Report

Petitioner next asserts that he was prejudiced by the absence of a report of Trooper Kochenderfer referenced by the Trooper at a pretrial hearing indicating that witnesses had seen only one set of footprints in the snow, that Abshire's automobile ignition had been on, and that Abshire had scraped the ice from his windows.  (Docket No. 1 at 24.)  Respondent counters that first, Trooper Kochenderfer testified as to the contents of his report at trial including the conditions of the crime scene upon his arrival twenty minutes after the explosion; second, that Kochenderfer was cross-examined regarding these issues during petitioner's pretrial hearing and that any statements made by

---

[4]  It is not hearsay-within-hearsay because there is no circumstantial proof of the original statement's authenticity. The victim's son could have been confused, biased (as his mother was involved with this crime), or overwhelmed.  Even assuming the investigating officer accurately reflected what the son stated, the report would only be useful to the extent that it records the fact that the son <u>said</u> his father had built the bomb, and not that his father <u>had</u> built the bomb.

Kochenderfer could have been used therein; and third, that
evidence that there was only one set of footprints could be
meaningless because the bomb could have been on the car before
the snow began to fall.  (Docket No. 27 at 15-16.)

A review of the testimony taken at trial indicates that
Officer Kochenderfer testified that although the engine was not
running when he arrived after the explosion, the key was in the
"on" position.  (Docket No. 27 at 724-25.)  Further, Kochenderfer
testified that he did not see any footprints around the
automobile.  (Id. at 737-38.)

The court agrees with the finding of the magistrate judge
that petitioner has not demonstrated actual prejudice from the
loss of Officer Kochenderfer's report because Officer
Kochenderfer testified as to the substance of what he found when
he arrived at the scene in his testimony.

### f.   Death of Fingerprint Examiner

Petitioner next contends that he was prejudiced by the death
of fingerprint examiner Vernon D. McCloud.  (Docket No. 1 at 24.)
Petitioner alleges that McCloud would have testified that his
"fingerprints were not on any evidence taken from the alleged
crime scene."  (Id. at 7.)

Petitioner has not demonstrated with specificity that
fingerprint analyses would have conclusively shown that
petitioner's fingerprints were not found on any item taken from

-18-

the crime scene.  Petitioner's allegation is entirely speculative and supports his absence from the crime scene.  This said, the absence of the fingerprint examiner does not conclusively exonerate petitioner, and therefore, petitioner has not demonstrated actual prejudice regarding this claim.

### g.  Absence of Records from Holiday Inn

Petitioner's final argument regarding the loss of records is that records, "as well as eyewitnesses" could have testified that no meeting took place between Humphries and himself at which petitioner was paid $2,000 following Abshire's death.  Respondent counters that even if records established that petitioner did not have a room, and eyewitnesses testified that petitioner was not present, this evidence alone would not have been enough to demonstrate that petitioner would have been exonerated.  Accordingly, the court finds that petitioner has not demonstrated actual prejudice arising out of the twenty-two year delay.

### h.  Conclusion

The court has found that petitioner failed to establish actual prejudice resulting from any result of the twenty-two year delay between Abshire's death and petitioner's indictment.

Further, the court finds that the state rebutted the presumption of prejudice arising under West Virginia law as discussed in State ex rel. Leonard v. Hey, 269 S.E.2d 394 (W. Va. 1980).  The trial court conducted a pretrial hearing under

Leonard in which it was established to the court's satisfaction that only Clayton Gaylor's admissions in 1998 allowed the state to have enough evidence to proceed against persons for Abshire's murder.  The trial court's finding is entitled to a presumption of correctness.  As such, petitioner's first objection is OVERRULED.[5]

### 2. The Threatened Use of Information Provided to Federal Prosecutors During Their Meeting with Petitioner Did Not Violate Petitioner's Constitutional Rights

Petitioner's next argument in his petition is that prosecutors acted improperly in their treatment of his case.  He presents three different arguments in support of this point.  First, petitioner alleges that he was denied due process when a former federal prosecutor, Morgan Scott, testified before the Grand Jury of Greenbrier County about statements petitioner made under a grant of immunity.  (Docket No. 1 at 36-54.)  Second, petitioner alleges that the state prosecutor described the involvement of petitioner and co-defendant Robert Brown in a number of crimes the Greenbrier County Grand Jury had no jurisdiction over.  (Id. at 54-55.)  Third, petitioner alleges that the indictment could not stand because it discussed events

---

[5]  Petitioner discusses Dickey v. Florida, 398 U.S. 30 (1970) and Howell v. Baker, 904 F.2d 889 (4th Cir. 1990) in his first objection.  Dickey with post-indictment delays.  See id., 398 U.S. at 38 (requiring the state to try criminals in a reasonable time post-indictment).  Howell, on the other hand, was a predecessor case to Jones.  As such, petitioner's argument under Howell fails for the reasons discussed above.

occurring in Allegheny County, Virginia.  For the reasons below, the court rejects all three of these arguments and orders that petitioner's second objection is OVERRULED.

> **a.   Using Petitioner's Statements at a Conference with Prosecutors Against Him Was Constitutional and Did Not Bar Petitioner from Testifying in His Own Defense**

Shortly after petitioner's conviction for extortion, petitioner's attorney arranged a meeting between petitioner and several federal prosecutors to advise them of what petitioner knew in respect to the bomb killings of three individuals.  A meeting was held at the federal courthouse in Roanoke, Virginia, and was attended by petitioner, his attorney, then Assistant U.S. Attorney Morgan Scott, and a few other federal prosecutors. Petitioner claims that during this meeting, he was promised immunity for his statements.  (Docket No. 1 at 36.)  He further states that Morgan Scott conceded this point of contention during the criminal trial of his co-defendant Carroll Eugene Humphries, which was held in Putnam County, West Virginia.  (_Id._ at 37.) Petitioner alleges that the substance of his statements was disclosed by Morgan Scott to Officer Kochenderfer in June 1978, and to the Grand Jury of Greenbrier County on August 27, 1998, when a special grand jury was convened with respect to petitioner's indictment.  (_Id._)

Respondent counters that petitioner never made any statements to federal prosecutors on may 12, 1978, pursuant to an agreement of immunity. (Docket No. 27 at 22.)  "No one agreed that immunity had been granted because there was no formal immunity from prosecution granted to petitioner by the federal authorities."  (Id. at 22-23.)  Respondent states that under 18 U.S.C. § 6003, "[t]he granting of immunity by federal authorities is part of the official court record.  No such order has been produced because none exists."  (Id. at 23.)  Further, because petitioner's claims of innocence now are at variance with his previous "seriously inculpatory statements," respondent argues that there is no "existing federal precedent which holds that an agreement to keep statements privileges allows a witness to perjure himself with impunity should the accused take the stand."  (Id.)

During the Greenbrier County Grand Jury proceedings held on August 27, 1998, Morgan Scott testified that prosecutors rejected petitioner's initial demands for full immunity, but that they agreed to not treat anything petitioner said as a confession.  (See Docket No. 6 at 121-22.)  Prosecutors did, however, advise petitioner that if he ever testified at trial to anything different than he told prosecutors at that meeting, they would use his statements at the meeting to impeach him.  (Id.)  Scott

indicates that petitioner agreed to these terms at that time.  (_Id._)

Regarding the death of Abshire, petitioner described the explosive device that Abshire had discovered on his car.  (_Id._ at 123.)  Scott indicated that petitioner did not admit actually constructing the bomb or placing it on the car, but stated that he had taken the person who placed the bomb on the car to Abshire's house and showed him how to do it.  (_Id._)  Petitioner indicated that the person who actually set the bomb was named Richard Byers.  (_Id._)

Scott's testimony never indicates that petitioner confessed to murdering Abshire or building the bomb that resulted in his death.  Scott's testimony only indicates that the government orally agreed not to use the substance of petitioner's statements as a confession by him.  Scott did not testify at petitioner's trial.  The only reference to Scott in the course of this case was at petitioner's pretrial hearing and before the grand jury.  Even if Scott relayed petitioner's statements to Officer Kochendorfer as petitioner claims, they were never used against him directly at trial.  Petitioner does not dispute this.

The court agrees with the magistrate judge's conclusion that, even without determining whether or not Morgan Scott's actions were in breach of an oral agreement with petitioner, petitioner has failed to demonstrate that Scott's actions

prejudiced him.  See United States v. Derrick, 163 F.3d 799, 806 (4th Cir. 1998) (stating that the Fourth Circuit has consistently recognized that "an indictment cannot be dismissed for prosecutorial misconduct absent a showing that the misconduct prejudiced the defendant.") Because petitioner was convicted at trial without Morgan Scott's testimony, any error that may have occurred in the grand jury proceedings did not flow into his criminal trial and render the jury's verdict suspect; the alleged error before the grand jury then becomes harmless.  See United States v. Mechanik, 475 U.S. 66, 73 (1986) (holding that the "jury's guilty verdict rendered harmless any alleged error in the grand jury's charging decision.").  As such, the court dismisses petitioner's argument regarding Morgan Scott's testimony before the grand jury.[6]

The court also dismisses petitioner's argument that the threat of Morgan Scott testifying to impeach petitioner deprived him of his right to testify in his own defense.  Under Rule 613 of the West Virginia Rules of Evidence, had petitioner testified to something different than he had said in his meeting with government prosecutors, the government would then be permitted to

---

[6]  Although the Fifth Amendment provides that an accused shall have his charges presented to a grand jury, this right has not been applied to the states through the Fourteenth Amendment. See Apprendi v. New Jersey, 530 U.S. 466, 477 n.3 (2000).  As such, his challenge to the validity of the grand jury proceedings is not cognizable on federal habeas review.  See United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1991).

impeach him with his prior inconsistent statements.  Petitioner
has no constitutionally-protected right to commit perjury.
Choosing not to testify was an option that petitioner had; the
state had the right to use his prior statements for the purposes
of impeachment.  As such, petitioner's objection is OVERRULED.

> **b.    Any Prosecutorial Misconduct before the Grand Jury
>        Was Rendered Harmless by Petitioner's Conviction
>        at Trial**

Petitioner's next claim is that the state prosecutor
unlawfully requested that a number of witnesses before the grand
jury describe in detail petitioner's involvement with crimes not
before the grand jury and matters the Greenbrier County Circuit
Court had no jurisdiction over.  As his basis for this claim,
petitioner cites United States v. Feurtado, 191 F.3d 423-24 (4th
Cir. 1999).

Feurtado is not applicable to this case because Feurtado
arose in the context of the review of a federal case by a federal
court; this case presents the review of a state case by a federal
court.  As discussed above, petitioner's rights to challenge
state grand jury improprieties through federal habeas are limited
by the fact he was convicted following a trial where the alleged
improprieties were not repeated.  As such, petitioner's argument
is OVERRULED.

### c.   Petitioner's Indictment was not Constitutionally Faulty

Petitioner's final claim in his second ground is that the indictment returned against him by the Grand Jury in Greenbrier County is "invalid on its face and cannot legally stand" because in Counts Two and Three, "Allegheny County, Virginia" is named. (Docket No. 1 at 58-59.)  Respondent counters that petitioner's claim is not cognizable under federal habeas review because the Fifth Amendment right to be indicted by a grand jury has not been extended to the states through the Fourteenth Amendment.  (Docket No. 27 at 28.)

Challenges to a state trial court's jurisdiction constitute matters of state law that are not cognizable under federal habeas review.  See Wright v. Anemone, 151 F.3d 151, 158 (4th Cir. 1998).  The only exception to this requirement is if the alleged error resulted in "a complete miscarriage of justice, or exceptional circumstances where the need for . . . habeas corpus is apparent."  Id.

As noted by the magistrate judge, petitioner has not demonstrated that the jury did not find that the acts occurred in Greenbrier County, particularly in light of the trial court's instruction to the jury regarding count three that they must find that petitioner "conspired to commit the acts in Greenbrier County." (See Docket No. 27, Ech. 16 at 892, 939-40.)  As such, th undersigned concludes that petitioner has not demonstrated

-26-

that his guilty verdict resulted from a complete miscarriage of
justice.  Because the court concludes that all of plaintiff's
arguments subsumed in his second objection are without merit, the
court hereby orders that this objection is OVERRULED.

> **3.    Introduction of Evidence of Petitioner's Other Crimes
> Did Not Violate the Ex Post Facto Clause of the United
> States Constitution**

Petitioner's next objection is that the trial court applies
the provisions of Rule 404(b) of the West Virginia Rules of
Evidence which permitted evidence of his prior conviction to be
brought into evidence at trial in violation of the Ex post facto
clause of the United States Constitution.  Petitioner states that
he cannot object to the findings of the magistrate judge because
he cannot determine from the legal materials at his jail what the
common law rule was regarding admission of past bad acts prior to
the enactment of the West Virginia Rules of Evidence.  In the
interest of fairness, even though petitioner did not fully
object, the court must conduct a de novo review of the
recommendation of the magistrate judge.  Having done so, for the
reasons provided below, the court dismisses petitioner's ex post
facto objection.

At petitioner's trial, extensive evidence concerning
petitioner's conviction for the attempted extortion of Carroll
Eugene Humphries was introduced "to prove [petitioner's]

knowledge of the murder of Billy Ray Abshire in that [petitioner] was attempting to extort $10,000 from Humphries and Katherine NLF Abshire because [petitioner] and Brown murdered Abshire for Humphries and Mrs. Abshire." (Docket No. 27, Ech. 20 at 2, 36.) Through this, respondent avers that petitioner's prior bad acts were "legally connected" with petitioner's charged offense of murder and were not admitted in violation of ex post facto prohibitions contained in the United States Constitution.

In evaluating the admission of this evidence, the state habeas court concluded that

> both at common law and now under Rule 404(b) of the West Virginia Rules of Evidence, the State may introduce evidence that the defendant committed other crimes for the purposes of showing motive, intent, plan, or the other factors enumerated in the rule. Nothing here indicates that there has been an unconstitutional violation regarding the applicability of Rule 404(b) of the West Virginia Rules of Evidence in petitioner's trial.

(Docket No. 15, Ech. 12) (citing State v. Johnson, 179 WVA. 629, 636, 371 S.E.2d 340, 347 (1988) (dealing with Rule 404(b)), and State ex rel. Collins v. Befell, 194 W. Va. 390, 400, 460 S.E.2d 636, 646 (1995) (reviewing an ex post facto challenge)).

In reviewing the state court's decision, the magistrate judge found that even in situations where a law is retrospective, it does not violate ex post facto protections unless it adds to the quantum of eventual punishment. (See Docket No. 34 at 46)

-28-

(discussing <u>Weaver v. Graham</u>, 450 U.S. 24, 28 (1981)).  Although procedural rules, such as changes to rules of evidence, can constitute ex post facto violations, they can only do so when they deprive defendant of substantial protections with which the existing law surrounds him at the time of his crime.  <u>See</u> <u>Collins v. Young blood</u>, 497 U.S. 37, 45 (1990) (internal citations omitted).  Here, as was found by both the state court and the magistrate judge, there was no ex post facto violation because the common law and the law under West Virginia Rule of Evidence 404(b) were almost identical.  Under both, the state was permitted to introduce evidence of petitioner's knowledge of the murder of Billy Ray Abshire.  Because the law did not change, there can be no ex post facto violation.  As such, petitioner's objection regarding the ex post facto clause is accordingly OVERRULED.

### 4.   Petitioner Has Not Established that His Trial Counsel Was Constitutionally Ineffective

Petitioner's next series of objections deal with allegations that he was denied effective assistance of trial.  In his objection, petitioner indicates that he disagrees with the finding by the magistrate judge that evidence petitioner's attorney failed to discover would not have made a difference at the outcome of petitioner's trial.  (Docket No. 36 at 13.)

Specifically, petitioner alleges that evidence and witnesses

that he has managed to obtain since his trial prove that he could
not have attended a Holiday Inn meeting which Clayton Gaylor
testified he attended, that he could not have hired a cab Clayton
Gaylor alleged he hired, and that he could not have visited a
Greyhound Bus terminal in Covington, Virginia, in 1976, because
there was no Greyhound station in that city at that time.  (Id.)
Petitioner alleges that his attorney was constitutionally
ineffective for not discovering this evidence prior to his trial,
and that his attorney's actions prejudiced his defense because he
did not have the means to fully cross-examine Clayton Gaynor's
testimony.  (Id. at 14.)

The standards established by the Supreme Court in
determining whether or not a defendant was denied his Sixth
Amendment right to effective assistance of counsel are set forth
in Strickland v. Washington, 466 U.S. 668, 687 (1984).  Under the
two-prong test provided in Strickland, a defendant must show
first that their counsel's performance was so deficient that it
fell below an objective standard of reasonableness, and second,
that counsel's deficiency resulted in prejudice so as to render
the results of the trial unreliable.  Id. at 687-91.  Regarding
the first prong, counsel's performance is entitled to a
presumption of reasonableness and judicial review of counsel's
strategic decisions is highly deferential.  Id. at 689.  The
Fourth Circuit Court of Appeals has recognized that ineffective

assistance of counsel may not be established by a "Monday-morning quarterbacking" review of counsel's choice of trial strategies. See Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), aff'd, 985 F.2d 553 (4th Cir.), cert. denied, 506 U.S. 1087 (1993).

Petitioner's only objections arising out of his ineffective assistance claim stem from his attorney's failure to conduct research and perform adequate investigation. (See Docket No. 36 at 14.)  In his petition, petitioner states that had his counsel "done the proper research and called the proper witnesses . . . counsel would have proven that the state's key witness was lying in his entire testimony" which was relied on by the jury in convicting petitioner.  (See Docket No. 1 at 84.)  Petitioner states that his counsel's investigation would have revealed that Clayton Gaynor testified falsely regarding his ride in a cab, a visit to a Moose Lodge, his trip to Covington, Virginia, and his brother's residence at a particular time in Richmond, Virginia. (Id. at 85-86.)  This evidence would also have been usable to impeach Clayton Gaylor's character.  (Id. at 86-88.)

The Supreme Court established in Strickland that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  When trial counsel has chosen not to investigate, his decision "must be directly assessed for reasonableness in all the circumstances, applying a

-31-

heavy measure of deference to counsel's judgments." Id.  In
determining the reasonableness of counsel's actions,
consideration may be given to "defendant's own statements or
actions." Id.

    Respondent counters that all of the information petitioner's
attorney failed to discover was minor. (See Docket No. 27 at
40.)  Respondent notes that petitioner's trial counsel "exposed
information that would raise serious issues with Clayton Gaylor's
credibility" such as his "past history of chronic alcoholism,
unemployment, drug addiction, mental illness, and criminal
history." (Id.)  Further, respondent avers that petitioner has
not demonstrated that the outcome of his trial would likely have
been different had this information been discovered. (Id. at 40-
41.)  "The jury was provided with more than ample evidence with
which to weigh the witness's credibility.  Petitioner has not
provided compelling evidence that the subject impeachment
evidence would have tipped the scales." (Id. at 41.)

    The magistrate judge wholly agreed with respondent's
arguments that petitioner had not adequately shown prejudice from
his counsel's failure to investigate regarding these specific
details of his brother's testimony.  Having reviewed the record,
and particularly Clayton Gaylor's testimony, this court must
conclude that the magistrate judge's decision was proper.  The
details petitioner wishes would have been brought out were minor

considering the scope of his brother's testimony.  Petitioner's trial counsel's decision to focus his cross-examination on Clayton Gaylor's substance abuse problems and mental illness appears to be the sort of tactical decisions Strickland's progeny have counseled against.  See, e.g., Carter v. Lee, 283 F.3d 240, (4th Cir. 2002) (limiting habeas review as to trial counsel's tactical decisions); Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983) (same). Because petitioner has not established the requisite prejudice under the second prong of Strickland, petitioner's objection regarding his attorney's ineffective assistance is OVERRULED.

### 5.   There Is No Evidence that Petitioner Was Convicted as a Result of False Testimony

In his fifth objection, petitioner alleges that he was denied a fair trial under the Due Process Clause of the Fourteenth Amendment because of alleged misconduct by the prosecuting attorney.  (Docket No. 1 at 92-93.)  Petitioner contends that the prosecuting attorney knowingly presented false and perjured testimony through the testimony of Clayton Gaynor. In his objections, petitioner provides that

> If the State Prosecutor had done the proper
> pre-trial investigation, he would have
> established that the testimony [of Clayton
> Gaynor] was false . . . . [Either, the]
> prosecutor failed to do the proper research
> or investigation or else he did so and
> discovered that Clayton Gaylor's testimony
> was in fact false and still chose to use him
> and his false testimony.

-33-

(Docket No. 36 at 15.)

As the magistrate judge noted, it is well-established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Bagley, 473 U.S. 667, 679-80 (1985). This said, petitioner bears the burden of demonstrating that the testimony is material, false, and that the prosecutor knew the testimony was false. See id. at 679. Prosecutorial misconduct occurs "not . . . where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." See Hambric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967). "Mere inconsistencies in testimony given by government witnesses do not establish the government's knowing use of false testimony." United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987).

As the magistrate concluded, petitioner has not shown that his brother's testimony is false. Although there appear to be inconsistencies in what he testified before the grand jury and at trial, such inconsistencies do not establish that the testimony presented to the jury was, in fact, false. Accordingly, the court agrees with the magistrate judge that petitioner has not met his burden to establish prosecutorial misconduct. His

-34-

objection is accordingly OVERRULED.

### 6.   Claims of Newly-Discovered Evidence are Not Cognizable in Petitions under 28 U.S.C. § 2254

Finally, in a supplemental petition, petitioner alleges that certain newly-discovered evidence supports his claims of perjury, prosecutorial misconduct, and ineffective assistance of counsel. (See Docket No. 7.)  In turn, respondent contends that this "new evidence" "could, at best, reveal contradictions in [petitioner's brother's] testimony, particularly in light of the impeachment evidence extracted by the defense during cross-examination." (Docket No. 27 at 50.)

The grounds for habeas relief based on newly discovered evidence are "exceedingly narrow." Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988), cert. denied, 489 U.S. 1071 (1989).  To obtain a new trial based on newly-discovered evidence, petitioner must "satisfy the severe burden of demonstrating that [such] evidence probably would have resulted in acquittal." United States v. Agurs, 427 U.S. 97, 111 (1976). The newly-discovered evidence "must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not grounds for relief on federal habeas corpus." Townsend v. Sain, 372 U.S. 293, 317 (1963); Herrera v. Collins, 506 U.S. 390, 401 (1992) ("[F]ederal habeas courts sit

to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact.").

Given this precedent, the court agrees with the finding of the magistrate judge that petitioner's newly discovered evidence, already discussed regarding his claims of ineffective assistance and prosecutorial misconduct, is neither newly discovered nor material.  As such, petitioner's objection regarding newly discovered evidence is OVERRULED.

### D.  Conclusion

For the reasons discussed above, the magistrate judge's decision was well-reasoned and supported by case law. Petitioner's objections are accordingly OVERRULED.

The Clerk is directed to forward a copy of this Memorandum Opinion to the petitioner, pro se, and to all counsel of record.

IT IS SO ORDERED this 22nd day of September, 2005.

ENTER:


David A. Faber
Chief Judge

-36-